All right, our next and last case for today is number 20-14639, Reiner Fuentes v. Classica Cruise Operator LTD., Mr. Redavid. Thank you, Your Honors. Good morning, and may it please the Court. I'm Jordan Redavid on behalf of the appellant, Mr. Fuentes. We're asking this Court to reverse the District Court's entry of summary judgment in favor of the defendants, and I'd like to categorize our arguments into two camps. First is that the District Court erroneously granted summary judgment on theories of vicarious liability, relying solely on the legal issue of notice, which this Court, in USCO v. NCL Bahamas, July of this year, which we filed as supplemental authority, basically said expressly what had been implicit before, which was that notice is not a legal requirement for the plaintiff to satisfy when the theory of liability on a cruise ship is the employee of the cruise ship's negligence, holding the cruise line vicarious. What negligence did you allege on the part of the employees? Just like in USCO, in this case, the complaint does have an availment, I believe it appears on the complaint of paragraph 12 or 13, which says that multiple security officers and employees were present when the verbal dispute began and failed to timely intervene. Those employees' failure to act is in and of itself a negligent act for which Mr. Fuentes, in this case, as this Court said in footnote one of USCO, presented a hallmark contention of vicarious liability. And you made that argument in your summary judgment briefing? No. Then that's a problem. Well, in our position, it's not for one clear reason, the wording of USCO. So in USCO- No, because if your complaint has language or a different theory, when summary judgment comes up, it's the party's obligation to tell the district court exactly how the complaint should be read and what theories you're going under. And I don't know that it's right to fault the district court for treating your theories as not involving vicarious liability as a way to get to a verdict on damages. I mean, this was treated from everything I've read at the summary judgment stage. This was treated not as a vicarious liability case. I think you're correct to say that reading. I read it the same in terms of how it was treated. The reason that I push back on that point, there's two reasons. Let me just expound on them. One, if USCO in July had created new law or said, hey, we're about to start carving a new path. I would agree that it would be unreasonable and improper to assume that the district court should be clairvoyant to know where this court's going to go, but what USCO actually said is, we're saying today expressly what has already been implicit in the law, which means that was the law that governed the district court. The second point is that in USCO, the cruise line there on appeal presented a similar concern to what Judge Jordan, what you're saying here, which is, hey, this was not really fleshed out before the district court. They're raising this issue for the first time on appeal. And in footnote one of USCO, the panel of this court said, that's not a sufficient basis for us to overlook it, and here's why. When you look at the complaint in USCO, there was an affairment that had the hallmarks of vicarious liability. And even though in the pleadings, or I should say in the motion practices summary judgment, it didn't come up squarely in that way. Nevertheless, that's how it's written, and we're taking up the issue. I think when you take those two aspects of USCO and you apply it, just on the vicarious affairment in this case, I think the district court was wrong to overlook that principle. Now, let me say this. Okay, well, okay, let's assume that that is correct, and that procedurally, you don't have a problem with vicarious liability being asserted. What was the evidence of the negligence of the employees in the summary judgment record? So the record has, on that specific point, not direct but vicarious, we have the testimony, this is the record sites of pages 12 and 13, predominantly of our brief. But the testimony was before the district court from security guard Saeed Alam. He said that he was trained on crowd control, knew to deescalate verbal altercations during disembarkation, and that if there was ever a verbal altercation, it shouldn't escalate once an employee was there, a security officer was there. But you can't prevent that from happening. Well, you can't prevent something from escalating. You can take steps to try to prevent it from escalating. But you're asking the insurer, it seems to me, you're asking that the cruise ship company be an insurer. Because how many, according to the log that was filed, how many security guards were at the disembarkation lounge when the altercation occurred? I believe the answer is three. Okay, three for 20 passengers. You think that's enough? I think that's what a jury needs to decide. No, no, no, I'm asking you. So if you think a jury can decide, then you're obviously going to argue that that's not enough, right? No, no, no, I'm sorry, maybe I misunderstood your question. The theory of direct liability would say, hey, inadequate staffing of security. Right, so that's my question to you. So- I thought your question was on vicarious, I'm sorry. Well, it started that way, but you started steering me, I think, toward the other part. Okay, let's stay on vicarious. What did the employees, the security guards, not do that was negligent? So the security guard's testimony who was present says he was present. There was a verbal altercation, and he actually initiated communication verbally with the person who ultimately hit our client. So to answer your question is to intervene, which is either get in between, distance the two parties. There's testimony from the chief of security, in this record, the chief of security and the security guards, that they were trained on this. This is part of crowd control. What did the employee do? Not, he didn't do, it's negative. No, he didn't do, no, no, no. You can't say he didn't do anything, because he did something. He saw the verbal spat begin. He called upstairs to get somebody else down, right? And what did he do with the two gentlemen who ended up having the fight? What did he do? You're telling me he just sat there and watched them? Well, I'm not going to presuppose. I mean, there's no video of it, and I wasn't- No, I'm not asking for a video. What does it, when he was deposed, what did he say he did, or what does your client say he did? What did the security guard do? One of the testimonies, the security guard started speaking to the, I'm going to say the aggressor, and then the punch was thrown, a sucker punch. What's he supposed to do? Distance the two physically. There was testimony about what is crowd control, essentially, what are you trained on? Part of de-escalation, these are their terms, not ours, but part of a de-escalation process with two people where verbal dispute has began, is to, at minimum, distance the two so that physical violence can't ensue. Okay, what is the security guard supposed to do about the three other guys who jumped in later and knocked your client to the ground and caused the fracture? On the vicarious aspect? Yes. The theory proceeds under that someone's present, has the training and knowledge to de-escalate, and failed to take a subject to stop them. And I'm asking you, what is the security guard supposed to do about the three guys who jump into the melee, knock your client to the ground, and cause him injury? On vicarious theory? Yes. Nothing. It stops there. Once the melee starts, I think now we're going into direct liability for the cruise ship, which is to say, why didn't you have- So the vicarious liability only goes to the first punch that was thrown. As pleaded, only goes to the failure to timely intervene before that punch was thrown. The first punch. So I read the pleadings and the record evidence. And that's the only punch that was thrown, because the other thing was the push to the ground, right? Correct. Okay. Everything else proceeds under direct liability on the cruise ship. Okay, tell me then, let's go to direct liability then. Tell me how you want us to write an opinion expressing the duty of the cruise line in this circumstance. A cruise line has a duty, we know that it's reasonable care under the circumstances generally. Now take that general standard and shape it to the facts of this case. A cruise line has a duty to do what? Where a cruise line knows that when crowds gather, and in this case the crowd is disembarkation, right? So a crowd of people waiting to exit a boat. But the global picture is when a cruise line is aware that crowds of customers or passengers gather, they know that increases the risk that verbal disputes between them will arise. That's in the record. There's also evidence from the testimony of the chief of security and the like. It's also why they secured the services of the third party G4 at the port. I think that's their name, the security company. But that verbal disputes have a tendency to escalate into physical. In fact, the testimony from the chief of security, which is on pages 11 and 12 of our brief, that has the record sites. It says, part of my job is crowd control. He was aware of other incidents where verbal arguments had led to fights or small scuffles. He said, quote, it was a daily routine. And this was another quote, I believe it was, gentlemen are in line disembarking and suddenly things happen. When you take that through the summary judgment lens, reading in the light most favorable to my client as the non-movement. To answer your question about duty, it goes like this. Where a cruise line has awareness that when crowds gather, verbal disputes can occur. And further, that verbal disputes might increase the risk of physical violence. And they trained their security on that. Their duty is to sufficiently train and adequately staff, such as to mitigate or prevent the risk of that harm happening. That's what the standard is. That's- To sufficiently train and to do what? And adequately staff. Okay, so here- In those environments. So here, what was the breach of the failure to train? Well, there's two ways to respond to that. One is, we have the, I don't want to say self- No, this is a simple question. What did they not do that caused the breach of the duty to train? This is what I'm getting at. We have security officers saying, when I started with Classica, I was trained. When we sit them down for a 30 v 6 deposition, that being Classica, with these areas of designation, the sole designee presented is not adequately prepared to testify about a whole series of things, including the training. And that was part of the reason why my client below sought evidentiary sanctions to say, look, it's going to be our burden to prove a trial, or prematurely, it's going to be our burden to rebut at a summary judgment phase all of these theories. And the designee that showed up was inadequately prepared, which prejudices my client's ability at a summary judgment stage to say, here, here's all the record evidence to show you what Classica did or didn't do for training, did or didn't do for staff. Let me ask the question this way. Hold aside for a moment the question of the 30 v 6 representative. I think the heart of the question that Judge Jordan is asking is, accepting that there was a duty of care here, what should those guards have done that they didn't do? As I understand it, Fuentes tells Hadley, you can't cut in the line, don't try to skip the line. A verbal altercation ensues between the two of them, no dispute about that, right? Correct. At that point, the security guard, Syed, nearby, as these folks were disembarking, observes the argument. As Judge Jordan said, he radios the chief of security to come down there, and he immediately steps in to separate Fuentes and Hadley. So far, no dispute about that, right? No, no dispute. As he's doing that, trying to de-escalate the situation, Hadley sucker punches from behind Fuentes in the face. And then another member of Hadley's group joins in the fight. All three men fall to the ground, the plaintiff fractures his elbow. Is that essentially a fair statement? Under these circumstances, what is it that Syed should have done differently, or that the cruise company should have done that it did not do under these circumstances? Where's the breach of the duty of care is what I'm asking. Primary breach is actually more on the being proactive side of it, as opposed to the facts which you recited. Paint the picture of a security guard reacting to something that, in my client's theory of liability, could have and should have been presented had the cruise line acted reasonably. Here's an example. The expert below for my client, Kim Peterson, testified, and he was former global security for other cruise lines, that even the location of where they queued up the people to disembark was a departure from their own norms and industry standard, because they weren't in front of the security guard. We also have, not just on cruise ships, but in all land-based torts with negligent security, the notion of deterrence, right? The idea that the physical presence of a sufficient amount of security guards or deter a third party criminal act from even occurring. Here we have a situation where, under the theory presented in the complaint and the record evidence below, at best you have initially one security officer in a sufficient proximity. Our theory is, look, you've hired G4 security, where are they? You could have had more security officers present to potentially deter this from happening, where are they? So on this record, do you have an expert who says they didn't have enough folks for the 20 who were disembarking, one wasn't enough, you needed three, three wasn't enough, you needed 20? Is there any evidence of that kind in this record? I don't want to misspeak on the exact words. The documentary is 48-9, I'll try and take a look before I come back up. Sure. I know that the opinions were definitely about the location, and I think you can infer from that, at least the part that I remember, being, hey, if you queue them up in front of where the security guard station is, the inference there is there's going to be an abundant presence of security which is going to adequately deter that. But I will look up that particular point, because I don't know if there was ever an- So if I understand what you're saying, they breached their duty of care, first because they queued up the disembarkees in the wrong place. Yes. And second, they breached their duty because they needed more guards. It wasn't enough just to have Syed there. Yes. Is there anything else they did that breached the duty of care, other than those- So as pled, there's also the theory of failure to train, which gets back to Judge Jordan's questions. I don't think the record, the record is not replete with, for a classicist standpoint, this is what we trained them on, this is when we did it, this is what was covered. And then some counter evidence to say, well, you should have covered this, that, and the third. And I was only bringing up the 30 v. 6, which I understand, Judge Marcus, you asked me to kind of put aside for the moment. But I was bringing it up to say, there has to be some interplay between what we can obtain in discovery versus what, well, hey, why wasn't this brought up to oppose summary judgment? There is some interplay between that. I understand my colleague on the other side has concerns that we didn't expressly bring it up. But I think that's really being hyper-technical when the sole basis of the 30 v. 6 motion, it wasn't asking for money. It was asking, hey, they're precluding our ability to rebut this stuff or later at trial prove it. So we need what the law affords us, which is protection against that. We don't get it, and then the next thing, summary judgment enters, and we're out. Let me ask you just this. I take it the testimony of Syed, the security guard on the scene, was taken, right? Yes. Deposition. And the testimony was taken in deposition form from the chief of security. That's correct. Were they asked about whether training was insufficient? I don't think wording was ever done like that. They were asked about training, but in terms of like, do you subjectively- Is there any evidence from the thrust of their testimony that you can plausibly argue that there's some evidence of insufficient training? From anything the chief of security said or from anything Syed said? Yes, but in only one way, to be completely holding myself to the record here, and here's how it goes. There is record evidence that the chief of security and Syed were trained on crowd control. If they're trained on crowd control, but this is how it manifests itself, right? Training in action, which is one security guard kind of in the proximity. Then the inference, which you're allowed to draw on a summary judgment record, and frankly should draw. The reasonable inference is, well, then that training is inadequate, because it didn't have the sufficient amount of people. They weren't equipped with the tools that they needed to de-escalate the situation before it escalated. That's our position on that. I see my time has expired, so thank you. All right, thank you very much. We'll see you back for rebuttal. Mr. Dono. Good morning, may it please the court. My name is Michael Dono, I'm here on behalf of Classic Recruits Operator. And I'll start from the beginning on the issue of vicarious liability, just to bring up some quick points on that. If you look at their brief on page two, it acknowledges, it states, this case is about notice. I believe if you were to perform a word search on the brief, at no point is there any indication there that the word vicarious liability even comes up. If you continue to look through the brief on page three, in their statement of the case, the in essence concede that there is no vicarious liability, this is not a vicarious liability case. Again, on page 11 of the principal brief, Mr. Fuentes states, that was not Mr. Fuentes' theory of liability, it was that Classica had actual or can become physical as happened here. Similarly, there was no objection in, even as far back as in the summary judgment in their response. Or here on the principal brief or in the reply brief, for that matter, that the complaint was presenting not only a direct liability claim against Classica, but that there was also this vicarious liability claim. This has only surfaced now when that USCO decision came down over the summer. That's on vicarious liability. Let's talk about direct liability then. Sure. So, what is the duty of a cruise ship company with regards to large crowds assembling on a portion of a ship? A cruise line, as you stated correctly earlier, their duty of care is reasonable care under the circumstances. As the district court correctly found, just because you have a crowd, that doesn't mean that there's a dangerous condition on board the ship. And this is particularly evident under the facts of this case, where there had been no prior similar incident of an altercation even taking place. Anything similar happening not only on this ship, but on the sister ship. And if you look at all the record testimony, is that these disembarkations would generally proceed smoothly. And that's part of the record, and that's what the reporting recommendations of the magistrate judge that was adopted by the district court confirmed. And this was something that had never happened before. So what is the duty of a cruise ship company with regards to crowds on a ship? You're telling me that their only duty arises when they have notice through prior similar acts, right? That's correct. They, well, they have a, in this particular case, it was that there was no. You have a disco on board a ship. Right. It's Saturday night after the captain's dinner. Everybody's had a little bit of the unlimited liquid available. And people are dancing and having a good time, and there are 250 people in the disco on the top deck on the ocean as the ship is going. Does a cruise ship company have a duty to have some security there? Yes, under those facts, they- Without any prior incidents. From my general knowledge of cruise lines, it is known that in that environment where there's alcohol being served, where, as you've described, there's a party type atmosphere that there's a risk. There's some type of duty maybe in that situation to provide security, which I believe that's what the industry does. Right, so there are some situations where crowds may not be inherently dangerous. There are some situations where common sense tells you that something may happen, and you want to be on the safe side, and you need to have somebody there to watch out that things don't get out of control. Sure, but the disco situation is not this disembarkation. I know, it's a hypothetical. And even looking at the facts of this case, there was a process in place to handle the crowd and make it as orderly as possible. Were there, by the way, I'm sorry to interrupt you, but were there photographs of the disembarkation lounge and its layout in the record or no? I have not seen any, no. Okay. There may be, but that's not something that I saw that was submitted in support of summary judgment or in response thereto. What I'll say- If I could just follow up on Judge Jordan's question for a moment. Did the record evidence establish how many people were involved in the line when they were about to disembark? Here. And where they were physically, how close they were to disembarking where they were? Sure. Were they on the same level as where you would disembark? Were they on another level and had to go down a flight of stairs? Or does the record tell us how many people were in the line, where the line was, and how many guards or security officers there were in relationship to this group of people disembarking? Okay, so I'm trying to find it here in my notes. I remember that the record supported that there were something like 20 people in the line. I think it has to be understood that Mr. Fuentes was right at the front of the line. And down the gangway were the two security guards that eventually ended up responding to this incident. Also, something that kind of puts in perspective, this was not a situation where everybody was crowded up against each other. That was not the case. I believe it was in Lillian Dominguez's deposition, which is plaintiff's wife, and that's at 48-8. She, I believe, testified that when the altercation was taking place, there was about four to five feet between Fuentes and Hadley. So this was not an instance where everybody was kind of crammed in together. There was space in between the passengers. And up until that point, even plaintiff describes the situation that he says that he saw no incidents while he was waiting to disembark. No one in line had an issue. He also says that he describes the disembarkation process as that the crew were actively moving people around to control the disembarkation process. So this was not anything that was ad hoc or the cruise line lost control of this crowd. Again, what the record supports is this disembarkation process was going smoothly like it had gone on countless occasions before. And there was nothing that alerted them to the fact that this particular altercation was gonna take place. What does the record show that Mr. Saeed did when, in the light most favorable to Mr. Fuentes, when the verbal altercation began? He immediately responded to the scene. He described himself as, or the record supports that he placed himself in between Mr. Hadley and Mr. Fuentes. In Mr. Fuentes' own word, he began to attempt to de-escalate the situation. He told Hadley to calm down. As soon as he turned around to tell Fuentes to calm down, that's when, in Mr. Fuentes' own words, he was blindsided by this punch that happened. It was a spur of the moment thing. So that's what Mr. Saeed did. In addition, he also contacted the Chiefs of Security, who came down from Deck 5 to Deck 3, who he, in turn, then contacted GS4 Security, which is the port security. Who they, in turn, then contacted, I believe it was Riviera Beach Police. By the time the Chief of Security came down from Deck 5 to Deck 3, Mr. Fuentes had already fallen and suffered the injury, right? Correct, and he describes that when he arrived, they had already been, there were two security guards there, and they had already separated Mr. Fuentes and Mr. Hadley. They had, for all intents and purposes, already de-escalated the situation and separated them, gotten them off the ground, and diffused the situation at that point. Is there evidence in the record about how long the verbal altercation went on before the security guard intervened? For that, I believe it's Lillian Dominguez, which is the, again, the wife. She says, and that's at 48-8, she says it was about, they were arguing for about two to three minutes. And that's at 35, page 35 of her depositions, lines 10 through 14. I thought there was some evidence in the record that they argued, somebody said they argued for 10 to 15 minutes before it became physical. Am I right about that? That is, if I remember correctly, that may have been Plaintiff, who said that they were exchanging words for several minutes.  That plaintiff's depositions at 47-1, and that's at page 99, line 25, where I think he says it was several, a couple of minutes, I think is what he said. Let's talk about the Rule 30B6 issue. Yes. Your deponent was woefully prepared, right, for that deposition. I would say he was prepared adequately for the 30 something different areas of inquiry. Obviously, there were some points that he could have been better prepared for and had a better answer, unfortunately he didn't. But the truth is, at the end, it had no consequence on the state of the discovery record. So for example, he did testify as to training, but after he was deposed, the chief security officer was also deposed and he provided testimony as to what training he received. Syed was also deposed. He provided testimony as to what training he received. A lot of what Mr. Fuentes complains about was provided by other deponents as well. So there was sufficient evidence on the record as to what training was received, as to the qualifications of these individuals to provide security. That was all addressed in their individual depositions. When I looked at the magistrate judge's order dealing with this 30B6 question, the magistrate judge notes that there was indeed, quote, a lapse in preparation, but that viewed in context of the entire deposition, which required Plummer to prepare for 30 broad areas of inquiry, Plummer's testimony and preparation fell within the acceptable limits of 30B6. That's what the magistrate judge says. We review that only for abuse of discretion rather than de novo. My question is, how lengthy was the actual deposition of the 30B6 witness? I want to say it was something about three and a half hours to four. That's from my recollection. I may be incorrect on that, but that's what I seem to recall. I know it was one of the arguments that we did raise in response to the motion for sanctions, that he did sit there and answer for several hours their various questions. As I understand it, Plummer could not provide specific details about an incident. One of the incidents. Were there other areas that Plummer was unable to respond to beyond that incident? Off the top of my head, I do not remember. I remember that the areas of inquiry that Fuentes had an issue with that related to the summary judgment was that one incident and the questions about training, which Jordan asked about. So there were two areas. There may have been others where they took issue with. I think one of the other issues was that the training that, or the protocols that are followed for security on board ship, I believe that the attorney for a classica that was defending the deposition took the position that a lot of those areas of inquiry were protected by some type of confidentiality, given the nature of what was in those documents. Namely, it's the threat or the concern that somebody who's terrorist, for example, may get their hands on this information and use it for something more nefarious than what we have here. Last question. I'm sorry, I didn't mean to cut you off. Was there an affidavit, a supplemental affidavit, presented to fill in the blanks of what the 30B6 could not say? There was some issue raised in that motion for sanctions as to the inability of plumber to provide detail as to the altercation that was noted on a list that was provided. It was an issue of, it said something along the lines of physical assault. It was on the grand celebration, which is the fleet mate. He wasn't able to provide any factual details as to what happened in that altercation. So classica went ahead and investigated what that incident was and then provided plumber's affidavit. And in that affidavit, the facts he provided were that this was a dispute. It took place two days before the incident here at issue on the other ship. And what it was, it was a domestic dispute. Husband and wife were having an altercation inside a state room. And that's what he was able to determine. So it was nothing that would have put classica here on notice of any issues with the disembarkation process. Or that Hadley and Fuentes would get into an altercation on this particular cruise. Or that there was anything that they should be aware of. Thank you. Thank you. Okay, Mr. Dovo, thank you very much. Mr. E. David, could I ask you a question just at the outset? I went back to look at your brief in this court, the blue brief, the first brief. And in it, because I just want to know what theory you say that you were traveling on. Whether it was vicarious liability, direct liability, both, or something else in addition to that. But in your blue brief, you say, in essence, this case is about notice. And then when you get to your argument section on pages 10 and 11. You say, the lower court accepted a false premise offered by classica in its summary judgment motion. That the alleged danger here was disembarkation of cruise ships generally. That was not Mr. Fuentes' theory of liability. It was that classica had actual and constructive notice. That verbal disputes between passengers can become physical, as happened here. Your theory went to actual and constructive notice, didn't it? Or did I, have I misunderstood? You didn't misunderstand anything in my brief. And the only time that I brought up vicarious liability was after reading this court's opinion in July. Which went back to parse through a plaintiff's pleading in a cruise ship case. Identify a specific affairment and say, hey, even though this wasn't flushed out below, we can address it. So you're reading my brief correctly? So it would be fair to say that you traveled on the theory of actual and constructive notice. You traveled on that theory in the district court and here. Up until this case came out of the circuit. Is that I- I don't want to misspeak. The plaintiff through trial counsel proceeded under both vicarious and direct. Although not explicit and very inartfully pled in a complaint. There is that affairment on vicarious. In terms of briefing, I address notice because that's the sole issue of the district court. Decided on, and at the time, this court's July opinion hadn't been issued. And after reading it, I wanted to fairly address it and incorporate it. The two points I want to bring up on rebuttal in my minute. No, there's no photos in the record that I'm aware of, of the ship. But yes, our expert did a ship inspection and was shown exactly where the line was queued up and all of that. So that would be, that was a basis. Can you tell me just from the record where the line was queued up? How close to where they were going to get off the ship to disembark the gangplank, if you will? I was looking for, I can't, otherwise I would have brought it, and I apologize. But the expert's affidavit, I believe, is 48-9. And the last thing I want to say, because I think it's important, my colleague got up and said, well, the inadequate preparation for 30B6 really didn't have an effect on summary judgment. I don't think we can say that when the same designee who says, hey, I don't know anything about these eight prior incidents, then later in support of summary judgment gives a declaration where he all of a sudden knows these details. They can't have it both ways. That's the prejudice from being inadequately prepared. And the very last thing I'll say is, to your- Aside the sanctions, and I'll let you then get to your last point. Did you seek to redepose the 30B6 deponent after he submitted a declaration? No, I believe discovery, the answer is no. But by that time, I believe discovery was closed. I think that deposition took place right on or near that deadline. Right, but the fact that discovery is closed doesn't necessarily preclude you from asking for some relief given the circumstances of what happened. It didn't preclude asking, and it wasn't asked. Okay, I interrupted your last point. Thank you, Judge, because it actually gets to your question about the DISCO hypothetical. Were this a case where no security was present during disembarkation? And all things being equal, it ends up on your desks, and you're asked to decide the direct liability theories. That would be a markedly different case than what's here for one reason. Since 1987, this court has recognized in negligent security cases for direct liability, that where the defendant actually arranges for the presence of security officers, that is probative of the foreseeability of risk. That's probative of their duty, and then you can then have evidence that it breaches. That case is Myers versus Ramada Hotel. It was cited in our brief. And so if we look at this record, we say, well, Classica admits they put security officers there, secured GS4, and their officers admitted they were trained on crowd control and their presence. You can infer from that, in fact, I would argue, must infer from that, given the summary judgment standard under Myers, that is sufficient evidence alone for the direct liability theories. And then the breach is failure to train. And adequate staffing. Not having enough people there? That's correct. How many people should they have, did your expert say they should have had there? Again, I don't know if that was in his affidavit, so I don't want to just speak out of turn. But he had to say that three was not enough. I believe, otherwise on the staffing issue, there wouldn't be a breach, right? If you had one security guard per person, it'd be really hard for you to argue, I think, that that would be a breach of a duty, if you had one per person. Of course, and instead of numerology, I think his phrasing fell under things. As a former global security guard, what they did was not sufficient under their own protocols or the industry standard. So I don't. Okay, I'll take a look at it. Thank you for your time. All right, thank you both very much. We're done for today and are in recess.